# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MARCO ANTONIO DIAZ,

        Plaintiff,

    v.                                   Civ. No. 23-1061 DHU/KK

MICHELLE KING, Acting Commissioner of
Social Security,[1]

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[2]

Before the Court is Plaintiff's Memorandum of Law (Doc. 17) ("Motion"), filed March 23, 2024, in which Plaintiff asks the Court to reverse and remand the decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). (*Id.* at 1, 20.) In support, Plaintiff argues that the administrative law judge who denied his claim erred by improperly analyzing subjective symptom evidence regarding his psychological and shoulder impairments. (*Id.* at 11-19.) On June 24, 2024, the Commissioner filed a response to Plaintiff's Motion, and on July 15, 2024, Plaintiff filed a reply. (Docs. 23, 26.) Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, I find that Plaintiff's Motion is well taken. I therefore recommend that the Court GRANT the Motion, REVERSE the Commissioner's decision denying benefits, and REMAND this matter to the Commissioner for further proceedings.

---

[1] Michelle King was appointed as the Acting Commissioner of Social Security on January 20, 2025, and is automatically substituted as a party under 42 U.S.C. § 405(g) and Federal Rule of Civil Procedure 25(d).

[2] By an Order of Reference (Doc. 28) entered on December 9, 2024, United States District Judge David H. Urias referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 14, 2019, Plaintiff Marco Antonio Diaz filed a claim for SSI, alleging disability beginning on January 1, 1989, due to anxiety and an arm injury. (AR[3] 73-75.) Plaintiff was 50 years old at the time of filing. (AR 35.) Plaintiff's claim was denied at the initial level on March 17, 2020, and at the reconsideration level on June 22, 2022. (AR 73, 88, 136-38.) Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Michelle Lindsay held on March 21, 2023. (AR 43, 130-31.) At the hearing, Plaintiff amended his alleged onset date to October 14, 2019.[4] (AR 47.) On May 10, 2023, the ALJ issued a decision finding that Plaintiff is not disabled under the relevant sections of the Social Security Act. (AR 24-37.) On July 13, 2023, the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (AR 8-10); *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). Plaintiff now asks the Court to reverse the ALJ's decision and remand this matter to the Commissioner for further proceedings.[5] (Docs. 1, 17.)

## II. THE ALJ'S DECISION

The ALJ reviewed Plaintiff's claim for SSI pursuant to the Commissioner's five-step sequential evaluation process ("SEP").[6] (AR 24-37.) At step one, the ALJ found that Plaintiff has

---

[3] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on January 25, 2024. (Doc. 13.)

[4] Although Plaintiff claims to have been disabled since 1989, he did not become eligible to receive SSI until he filed an application for benefits on October 14, 2019. (AR 74); 20 C.F.R. §§ 416.202, 416.501.

[5] The Appeals Council extended the time for Plaintiff to file this action to December 1, 2023, and Plaintiff timely filed his complaint on November 29, 2023. (Doc. 1-1 at 2.)

[6] The five-step SEP requires the ALJ to determine whether:

    (1) the claimant engaged in substantial gainful activity during the alleged period of disability;
    (2) the claimant has a severe physical or mental impairment (or combination of impairments) that
        meets the duration requirement;

2

not engaged in substantial gainful activity since his alleged onset of disability. (AR 26.) The ALJ found at step two that Plaintiff suffers from the severe impairments of osteoarthritis of the left shoulder, mild degenerative changes of the lumbar spine, mild obesity, anxiety disorder, posttraumatic stress disorder ("PTSD"), and alcohol abuse. (AR 26.) At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the criteria of any listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 26-29.)

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC").[7] (AR 29-35.) Physically, the ALJ found that Plaintiff has the RFC

> to perform light work as defined in 20 [C.F.R. §] 416.967(b) except [he] can lift and carry only 10 pounds with the left, nondominant upper extremity alone; however, with both upper extremities together, he can lift and carry 20 pounds. [Plaintiff] can never climb ladders, ropes, or scaffolds. He can only occasionally

---

(3)  any such impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)  the claimant can return to his past relevant work; and, if not,
(5)  the claimant is able to perform other work that exists in significant numbers in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. § 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof at the first four steps of the analysis, and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

[7] The applicable regulation defines a claimant's RFC as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your [RFC] is the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).

crawl.[8] He can frequently stoop, crouch, [and] kneel.[9] He can only occasionally reach overhead with the left, nondominant upper extremity; however, forward and lateral reaching is not limited. He must avoid more than occasional exposure to extreme cold. He must completely avoid unprotected heights.

(AR 29.) Mentally, in turn, the ALJ found that Plaintiff has the RFC

to understand, remember, and carry out simple instructions. He is able to maintain attention and concentration to perform and persist at simple tasks at a consistent pace for two hours at a time without requiring redirection to task throughout an eight-hour workday and 40-hour workweek. He can have occasional interaction with the general public and superficial interactions with coworkers and supervisors. He requires work involving no more than occasional change in the routine work setting.

(AR 29.)

After determining that Plaintiff does not have any past relevant work, the ALJ proceeded to step five and found that Plaintiff can perform the requirements of three representative occupations that exist in significant numbers in the national economy, specifically, housekeeping cleaner, small products assembler, and power screwdriver operator. (AR 35-36.) The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since October 14, 2019." (AR 36.)

### III. STANDARD OF REVIEW

The Court's review of the Commissioner's final decision on a claim for disability benefits is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the

---

[8] The Commissioner defines the term "occasionally" to mean "occurring from very little up to one-third of the time," *i.e.*, "generally … no more than about 2 hours of an 8-hour workday." *See, e.g.,* SSR 83-10, 1983 WL 31251 at *5 (S.S.A. Jan. 1, 1983).

[9] The Commissioner defines the term "frequently" to mean "occurring from one-third to two-thirds of the time," *i.e.*, from about 2 hours to 6 hours of an 8-hour workday. *See, e.g.,* SSR 83-10, 1983 WL 31251 at *6 (S.S.A. Jan. 1, 1983).

Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this [C]ourt with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### IV. DISCUSSION

**A.    Legal Standards Governing Evaluation of Subjective Symptom Evidence**

In determining whether a claimant is disabled, an ALJ must consider all of the claimant's reported symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 416.929(a). This evaluation requires two steps. First, the ALJ must determine whether there is a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 416.929(b). Second, if such an impairment exists, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. 20 C.F.R. § 416.929(c)(1).

The Court ordinarily defers to the ALJ, as the trier of fact, on the issue of the claimant's credibility. *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993); *Casias v. Sec'y of Health & Hum. Servs.*, 933 F.2d 799, 801 (10th Cir. 1991). Nevertheless, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3P, 2017 WL 5180304, at *10 (S.S.A. Oct. 25, 2017). Rather, the ALJ's evaluation of subjective symptom evidence "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Brownrigg v. Berryhill*, 688 F. App'x 542, 546 (10th Cir. 2017); *see also Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (ALJ's evaluation of claimant's symptoms "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings").

6

**B.**     **The ALJ erred in evaluating Plaintiff's subjective symptom evidence regarding his psychological impairments.**

1.     Evidence Regarding Plaintiff's Psychological Impairments

Plaintiff has been diagnosed with PTSD, generalized anxiety disorder ("GAD"), GAD with depressive symptoms, major depressive disorder, mixed anxiety and depressive disorder, unspecified anxiety disorder (rule out avoidant personality disorder), alcohol dependence, and alcohol use disorder. (AR 391, 409, 427, 442.) He received mental health treatment at Desert Sky Counseling Services, LLC ("Desert Sky"), from 2015 to 2020 or 2021. (AR 64-65, 391, 427.) In December 2019, Desert Sky provider Stephanie Lynch, Ph.D., R.N., PMHNP-BC, wrote that Plaintiff was taking alprazolam[10] and bupropion[11] to help manage his psychological conditions. (AR 391.) Nurse Practitioner ("NP") Lynch opined that these conditions "make it extremely difficult [for Plaintiff] to maintain gainful employment." (AR 391.) Plaintiff testified that he stopped going to Desert Sky after they changed his medication and the new medication made him feel "really groggy."[12] (AR 64-65.)

On August 4, 2020, NP Cindy Montgomery, a primary care provider at Mountain View Internal Medicine, noted that Plaintiff was still taking alprazolam and bupropion for his psychological conditions. (AR 423, 427.) At this appointment, Plaintiff reported that his anxiety and depression interfere with his relationships, household activities, sleep, and work, and cause

---

[10] Alprazolam, or Xanax, "is used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)." https://medlineplus.gov/druginfo/meds/a684001.html (last accessed Jan. 22, 2025).

[11] Bupropion, or Wellbutrin, "is used to treat depression." https://medlineplus.gov/druginfo/meds/a695033.html (last accessed Jan. 22, 2025).

[12] Plaintiff gave a more detailed explanation to consultative examiner Rod J. Merta, Ph.D., who recorded that Plaintiff was "for years treated by [NP] Lynch …, who prescribe[d] him Xanax, and he would also receive counseling from a woman by the first name of Kristi. [NP] Lynch was suddenly replaced by someone else, who chose to take him of[f] the Xanax and replace it with another medication that made him feel sick. He chose not to take the medication and ceased attending Desert Sky altogether." (AR 439.)

panic attacks, high irritability, hypersensitivity, insomnia, "restlessness/agitation," sleep disturbances, anxiety with muscle tension, inability to make decisions, "despair/hopelessness," social withdrawal, and "decreased effectiveness/productivity." (AR 424-25.) NP Montgomery observed that Plaintiff presented with an "anxious, depressed, and abnormal affect." (AR 426.) She recorded that she "wanted labs obtained and he refused," and that she would "have to work him into that as his anxiety is too high" and would "have to address problems singularly and slowly to keep him on target." (AR 427.)

Plaintiff testified to and reported symptoms and limitations due to anxiety. At his hearing before the ALJ, Plaintiff testified that he has "trouble focusing on one task at a time" and "jumps" from one task to another "because of [his] anxiety." (AR 62-63.) He also testified that when someone gives him instructions that are "a little complicated," he needs someone to explain it to him again about five times out of ten. (AR 59.)

At the hearing, and also to consultative examiner Marc A. Caplan, Ph.D., Plaintiff reported that he has panic attacks every day. (AR 56, 405.) He testified that when he has a panic attack, he gets "a little frustrated and angry," "just want[s] it to go away," and sometimes does not want to go outside. (AR 57-58.) In Adult Function Reports ("AFRs") and to Dr. Caplan, he also reported symptoms of sweating, stuttering, shaking, heart racing, memory fog, difficulty sitting still, and racing thoughts of worry. (AR 323, 327, 405.) At his hearing, when his counsel asked him about triggers for his panic attacks, he referred to "people … passing by," "a lot of people," "a lot of traffic," and "a lot of cars passing by." (AR 58.)

Plaintiff also reported symptoms due to PTSD. In an AFR and to Dr. Caplan, Plaintiff reported that he experiences flashbacks, hypervigilance, nightmares, avoidance of law enforcement, panic and increased heart rate when triggered, fear of loud noises, struggles with

memory, and avoidance of social situations. (AR 329, 405.) At his hearing, he explained that he suffered traumatic events during his childhood, including that his father left his mother with seven children and his mother "always attacked [him]" and hit him and his siblings. (AR 57; *see also* AR 329 (reporting "flash backs from [his] childhood"); AR 439 (reporting that he and siblings were "physically abused by his mother").) In addition, Plaintiff told Dr. Caplan and consultative examiner Rod J. Merta, Ph.D., that he has PTSD from events that occurred while he was incarcerated.[13] (AR 405, 440.)

> At his hearing before the ALJ, Plaintiff discussed his social anxiety symptoms, stating,
>
> I don't know, I don't know, it's just, like, because it's hard for me sometimes, you know, to live in—you know, I live in the town, I don't like to go out, you know, I don't like to go to parties or nothing. I like to just—I mean, I can hang around with, like, friends who are two guys, two of my friends and that's it, no more than that. And I have to know them really well, you know.

(AR 57.) Asked whether he "get[s] upset with other people," Plaintiff responded, "[n]o, I love people and the people love me because they understand me." (AR 59.) The ALJ subsequently asked, "correct me if I'm wrong, Mr. Diaz, it sounds like you like people, sometimes you can't be around people—a lot of people you don't know," to which Plaintiff responded, "[y]eah, I feel very uncomfortable being around people that I don't know." (AR 60.)

Likewise, in AFRs and to Dr. Caplan and Dr. Merta, Plaintiff reported having no trouble getting along with others or maintaining relationships with family, a long-distance girlfriend, friends, and neighbors,[14] but being anxious around strangers, groups, and crowds. (AR 290-91,

---

[13] Plaintiff told Dr. Caplan that he was incarcerated for multiple driving-while-intoxicated convictions but was misidentified and placed in a maximum-security prison where he witnessed violence between inmates and felt his life was threatened. (AR 403, 405.) According to Dr. Merta, Plaintiff identified "possible trauma" from witnessing violence in prison, but he was "not able" to "identify[] PTSD symptoms." (AR 440.)

[14] However, Plaintiff told Dr. Caplan that he has a "strained relationship" with his two adult children due to his anxiety, which prevented him from attending his daughter's wedding, and "has struggled with his neighbor, who has two dogs

358-59, 403-07, 440, 442.) He testified to being "too afraid to go to the doctors," reported cutting his own hair because he is "nervous to go to the barber," and told Dr. Caplan that he did not attend his daughter's wedding due to "intense anxiety." (AR 65, 324, 404.) In April 2021, he reported that he went to church "once a month maybe" but that he "[felt] better being alone," and at his April 2022 examination by Dr. Merta, he reported that he had stopped going to church due to COVID-19, though he planned to start again. (AR 327, 442.) He also told Dr. Merta that he had recently gone to a party but "did not stay for long, because he prefers to be with one or two people at a time." (AR 442.) He was visibly anxious at his examination by Dr. Caplan, but not at his examination by Dr. Merta. (AR 407, 440.)

With respect to his educational history, Plaintiff testified that he dropped out of high school and though he tried to obtain a GED he did not pass. (AR 48.) Plaintiff told Dr. Caplan that he withdrew from school due to the negative influence of peers as well as significant anxiety about attending classes, increasing self-doubt, and a desire not to be seen by his peers. (AR 403.) He also reported that he did not succeed in getting his GED due to significant anxiety. (AR 403.) Plaintiff told Dr. Merta that he dropped out of high school because "he was naive and dumb." (AR 440.)

Regarding work, Plaintiff testified that about twice a week he does "little odd jobs" like cleaning small yards and helping friends to dump trash. (AR 51.) He explained that he worked as a helper at an oil-truck shop for about one month but left the job because he "didn't want to be there no more," he needed to take care of his house and dog, and he "wanted to go back home." (AR 52-53.) Plaintiff reported to Dr. Caplan

> that he briefly worked as a painter for a construction company but left due to having to engage in contact with a large number of co-workers at one time. He stated that he struggles with working with multiple people at one time, as he becomes anxious

who are consistently barking and frightening [Plaintiff]," which prevents Plaintiff from "being able to keep up with his yardwork the way he would like." (AR 404, 406.)

around large crowds of people. Mr. Diaz also reported that he had previously worked as a dishwasher, which ... allowed for minimal contact with multiple people. He stated he was in this position for 1 month, until the manager had asked him to begin waiting tables.

(AR 403.) To Dr. Merta, Plaintiff reported that he had worked as an onion factory worker, yard cleaner, roofer, dish washer, landscaper, rock wall builder, car wash worker, and trench digger, but was "no longer working on account of having no car and no demand for work. He is also no longer sure that he can work on account of his anxiety and asocial personality traits." (AR 440.)

As for his activities, Plaintiff testified that he has not driven for more than 20 years because he becomes "real scared" when he drives. (AR 49-50.) Asked how he gets where he needs to go, he said that he asks his friend, neighbor, or son for a ride, takes the bus, or rides his bike. (AR 50, 61-62.) Plaintiff stated that his friend drove him to the hearing, and that during the drive he had a "really bad" panic attack "because there was a lot of traffic." (AR 56.) He also testified that he used to take the bus to see his friend but has not taken the bus lately. (AR 63.)

In AFRs, Plaintiff indicated that he shops for necessities like groceries and hygiene products once or twice a month. (AR 288, 326, 357.) At his hearing, he described his shopping trips as follows:

> I just go, get whatever I can, get, like, my lettuce and my milk, and then—no, no, I tell, like—people tell me, like, excuse me, but sometimes, like, everybody's watching me, and so I try not to make no eye contact. So I just go, get my stuff, pay, and get out; that's the way I do it.

(AR 57-58.) Plaintiff told Dr. Caplan that he has difficulty leaving his home to shop or attend appointments and "typically has to take his Alprazolam in order to leave." (AR 406.)

At his hearing and in AFRs, Plaintiff reported doing chores around his mobile home and yard. (AR 49, 61, 286-87, 325, 356.) He also reported preparing sandwiches, frozen dinners, tacos, and enchiladas, but noted that "sometimes" he "can't concentrate in cooking and eat[s] whatever"

and "sometimes" he is "too depressed to cook." (AR 61, 287, 325, 356.) With respect to hobbies, Plaintiff reported that he enjoys fishing but has not gone since he was about 15 years old, does not have a fishing license or the ability to drive, and "nobody takes [him]." (AR 289, 327.)

2. <u>Prior Administrative Findings and Medical Opinions regarding Plaintiff's Psychological Impairments</u>

In March 2020, non-examining state agency consultant Richard Sorensen, Ph.D., found that Plaintiff is markedly limited in the ability to interact appropriately with the general public, and moderately limited in the abilities to: (a) remember locations and work-like procedures; (b) understand remember, and carry out detailed instructions; (c) maintain attention and concentration for extended periods; (d) work in coordination with or proximity to others without being distracted by them; (e) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (f) accept instructions and respond appropriately to criticism from supervisors; and, (g) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 84-85.) He further found that, "when treatment/medication compliant and substance free," Plaintiff

> retains the capacity to understand, remember, and carry out simple instructions, attend and concentrate sufficient to complete a routine work day without significant interruptions from psychologically-based symptoms[,] exercise reasonable judgment[, and] interact appropriately with coworkers[,] supervisors and the general public on an incidental basis.

(AR 85.)

In June 2022, non-examining state agency consultant Kay Cogbill, M.D., found that Plaintiff is moderately limited in the abilities to: (a) carry out detailed instructions; (b) ) maintain attention and concentration for extended periods; (c) sustain an ordinary routine without special supervision; (d) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and

length of rest periods; (e) ask simple questions or request assistance; (f) accept instructions and respond appropriately to criticism from supervisors; and, (g) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (AR 107-09.) She further found that Plaintiff "retains the capacity for work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete." (AR 101.)

In February 2020, Dr. Caplan opined that Plaintiff's "moderate cognitive impairment" may be due to "severe levels of anxiety and trauma response," and that Plaintiff's "anxiety and trauma response appear to be impairing the majority of his daily functioning and ability to interact with others." (AR 408.)

In April 2022, Dr. Merta opined that Plaintiff "can reason" and "is capable of understanding verbal and written instructions." (AR 442.) He further opined that Plaintiff's "anxiety regardless of etiology may at times interfere with his overall cognitive functioning at a level of 'Moderate—some limitations' to 'Marked—significant limitations,'" but that "[w]hen not so impeded, he is capable of sustaining concentration on many if not most of the cognitive functions contained with his [activities of daily living] and work-related tasks, and he can pace himself and persist until their completion." (AR 442.) In addition, Dr. Merta opined that Plaintiff's "anxiety regardless of etiology may interfere with his social functioning at a level of 'Marked—significant limitations,' to 'Severe—almost a complete inability to function.'" (AR 442.)

3.    The ALJ erred in evaluating Plaintiff's subjective symptom evidence regarding his psychological impairments.

In his Motion, Plaintiff argues that the ALJ erred in analyzing his subjective symptom evidence regarding his psychological impairments. (Doc. 17 at 15-19.) In particular, he argues that the ALJ mischaracterized his testimony when she said he "testified that he does not get along with

other people, but then testified that he loved people, and people loved him." (*Id.* at 15-16; *see* AR 32, 35, 59.) He also takes issue with the ALJ's failure to consider his testimony and reports regarding how infrequently he engages in activities on which the ALJ relied in assessing his mental RFC. (Doc. 17 at 17-18.) Overall, Plaintiff asserts that the ALJ failed to adequately address the overwhelming evidence that he suffers from "extreme apprehension [of] being around strangers [and] in crowds." (*Id.* at 15-19.)

Following a careful review of the record, I agree that the ALJ's evaluation of Plaintiff's subjective symptom evidence regarding his psychological impairments was erroneous in four respects. First, the ALJ made a clear factual error in finding that Plaintiff's testimony was inconsistent because he "testified that he does not get along with other people, but then testified that he loved people, and people loved him." (AR 32, 35.) Contrary to the ALJ's finding, Plaintiff never testified that he does not "get along" with other people. (AR 32, 35; *see* AR 48-66.) In fact, he testified that he does not "get upset" with other people, (AR 59), which is actually consistent with his testimony and reports that he loves, is loved by, and gets along with others.[15] (AR 59, 290-91, 358-59.) Thus, the ALJ's finding on this point is not supported by substantial evidence.[16] *See Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (ALJ's conclusion was not supported by substantial evidence where it was belied by a letter in the record); *Stills v. Astrue*, 476 F. App'x

---

[15] Plaintiff did not testify to failing to get along with others, but rather to being anxious around strangers, groups, and crowds. (AR 56-60, 65; *see also, e.g.,* AR 290, 324, 327, 354, 358.) Getting along with others is, of course, distinct from feeling at ease with strangers and crowds. And indeed, the ALJ appeared to understand this distinction, stating to Plaintiff, "[s]o correct me if I'm wrong, Mr. Diaz, it sounds like you like people, sometimes you can't be around people—a lot of people you don't know," to which Plaintiff responded, "[y]eah, I feel very uncomfortable being around people that I don't know." (AR 60.)

[16] The ALJ also arguably misstated Plaintiff's testimony regarding his ability to follow instructions. Specifically, she said Plaintiff "testified that he is able to remember instructions, although [he] might need a little refresher." (AR 35.) In fact, however, Plaintiff testified that if instructions are "a little complicated," he needs someone to explain them to him again about half the time. (AR 59.)

159, 161 (10th Cir. 2012) (agency's reasoning was not supported by substantial evidence where it was "incorrect"); *see generally Kepler*, 68 F.3d at 391 (ALJ's evaluation of subjective symptom evidence must be supported by substantial evidence); *Brownrigg*, 688 F. App'x at 546 (same).

Second, in rejecting Plaintiff's subjective symptom evidence regarding his social anxiety, the ALJ relied on activities in which Plaintiff claims he infrequently or no longer engages. Specifically, the ALJ relied on Plaintiff's testimony and reports that he shops for groceries, rides the bus, and likes to go fishing. (AR 32, 34-35.) Yet she failed to acknowledge his testimony and reports that he only shops once or twice a month, used to take the bus but has not taken it lately, and has not gone fishing since he was about 15 years old. (AR 63, 288-89, 326, 357.) The ALJ erred in relying on these activities to reject Plaintiff's subjective symptom evidence without evaluating his testimony and reports about how infrequently he engages in them. *See Krauser v. Astrue*, 638 F.3d 1324, 1332–33 (10th Cir. 2011) ("[S]poradic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity."); *Thompson*, 987 F.2d at 1490 (same) (brackets omitted); *cf. Bibbs v. Apfel*, 3 F. App'x 759, 763 (10th Cir. 2001) ("Evidence that claimant … still enjoys fishing (assuming that he has not given up fishing, as he testified) … does not support the ALJ's determination of nondisability.").

Third, in rejecting Plaintiff's subjective symptom evidence regarding his psychological impairments, the ALJ relied on the fact that he is no longer getting treatment for these impairments, but she failed to evaluate his proffered reasons. (AR 35.) Specifically, Plaintiff testified that he needs to make an appointment with a psychiatrist or psychologist but "they" do not have any

openings and he is on a waiting list. (AR 63-64.) Also, he indicated that he no longer has a primary care provider because he is "too afraid to go to the doctors."[17] (AR 65.)

"The failure to follow a prescribed course of treatment, *without good reason*, is grounds for denial of disability benefits, and can be the basis for discrediting a claimant's subjective complaints." *Garcia v. Saul*, 509 F. Supp. 3d 1306, 1323 (D.N.M. 2020) (citing *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990) and 20 C.F.R. § 404.1530(b)) (emphasis added); *see also* 20 C.F.R. § 416.930(b). But before an ALJ may rely on the claimant's failure to pursue treatment to support her rejection of subjective symptom evidence, she must consider, among other things, whether the failure "was without justifiable excuse." *Thompson*, 987 F.2d at 1490. Here the ALJ did not do so, and this omission further undermines her evaluation of Plaintiff's subjective symptom evidence.[18]

Fourth, the ALJ wholly failed to discuss significantly probative record evidence supporting Plaintiff's subjective symptom evidence. Initially, the ALJ ignored NP Montgomery's notations regarding Plaintiff's psychological impairments. As noted above, NP Montgomery recorded Plaintiff's reports that his anxiety and depression interfere with his relationships, household activities, sleep, and work, and that he suffers from panic attacks, irritability, hypersensitivity, insomnia, restlessness, agitation, sleep disturbances, muscle tension, inability to make decisions, despair, hopelessness, social withdrawal, and "decreased effectiveness/productivity." (AR 424-

---

[17] This accords with NP Montgomery's notation, discussed below, that she would have to "work [Plaintiff] into" getting lab tests because "his anxiety is too high." (AR 427.) It also accords with Plaintiff's report to Dr. Merta that he stopped getting treatment at Desert Sky after they moved him to a new provider who changed his medication. (AR 439.)

[18] It is, of course, for the ALJ to assess whether Plaintiff's proffered reasons for failing to continue psychological treatment are credible and justifiable. *Thompson*, 987 F.2d at 1490; *Casias*, 933 F.2d at 801. However, I do note the apparent catch-22 in which Plaintiff allegedly finds himself, *i.e.*, his fear of going to the doctor inhibits his ability to get treatment for that fear. (AR 65.)

25.) She also observed that Plaintiff presented with an "anxious, depressed, and abnormal affect," and that due to his anxiety, she would have to "work him into" getting lab tests and would "have to address problems singularly and slowly to keep him on target." (AR 426-27.) The ALJ mentioned none of this evidence. (*See* AR 24-37.)

Further, the ALJ failed to discuss Plaintiff's reported panic attacks. According to Plaintiff's testimony, AFRs, and reports to Dr. Caplan, these panic attacks occur daily, are triggered by a lot of cars or people, and cause symptoms and limitations including frustration, anger, avoidance of going outside, sweating, stuttering, shaking, heart racing, memory fog, difficulty sitting still, and racing thoughts. (AR 56-58, 290, 323, 327, 405.) Yet there is no mention of panic attacks in the ALJ's decision. (*See* AR 24-37.) The ALJ erred in failing to discuss any of this significantly probative evidence, which undercuts her rejection of Plaintiff's subjective symptom evidence regarding his psychological impairments. *Grogan*, 399 F.3d at 1262; *Clifton*, 79 F.3d at 1009–10.

In sum, in the four ways just described, substantial evidence does not support the ALJ's evaluation of Plaintiff's testimony and reports regarding his psychological symptoms and limitations, particularly with respect to his allegedly debilitating anxiety around strangers, groups, and crowds. In addition, the ALJ failed to redeem these errors by citing to other substantial evidence in the record to support her rejection of Plaintiff's subjective symptom evidence on this issue.[19] (*See generally* AR 26-35); *cf. Pickup*, 606 F. App'x at 433-34 (affirming ALJ's evaluation of subjective symptom evidence despite errors where she supported the evaluation with other

---

[19] In rejecting Plaintiff's subjective symptom evidence regarding his psychological impairments, the ALJ observed that Plaintiff "has friends that are willing to help him out." (AR 35.) However, this observation is beside the point, in that nowhere did Plaintiff testify or report that his psychological impairments prevent him from having any friends. Rather, again, he testified and reported that he has difficulty being around strangers, groups, and crowds.

substantial evidence). In fact, other record evidence affirmatively supports Plaintiff's testimony and reports regarding his psychological symptoms and limitations.[20]

The Commissioner argues that the ALJ's evaluation of Plaintiff's subjective symptom evidence regarding his psychological impairments was nevertheless proper because: (1) the ALJ "reasonably assessed Plaintiff's overall claim that he could not work due to anxiety"; (2) Plaintiff's testimony and reports do not show that he had greater functional limitations than what the ALJ included in Plaintiff's RFC; and, (3) "the ALJ reasonably relied on the various examinations and opinions provided by consulting examiners and state agency medical and psychological consultants" because "Plaintiff provided limited testimony of debilitating symptoms and provided almost no medical records to support his claim of disability[.]" (Doc. 23 at 10-14.) But the errors and omissions described above substantially undermine the ALJ's assessment of Plaintiff's 'overall claim' of psychological disability. And importantly, the ALJ relied on these errors and omissions to reject not only Plaintiff's 'limited testimony of debilitating symptoms,' but also his reports of such symptoms in AFRs and to NP Montgomery, Dr. Caplan, and Dr. Merta, as well as prior administrative findings and medical opinions that appear to support greater functional limitations than those included in Plaintiff's mental RFC. Thus, the Commissioner's arguments are without merit.

Finally, the ALJ's errors and omissions in evaluating Plaintiff's subjective symptom evidence regarding his psychological impairments are not harmless. The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless,

---

[20] For example, every assessment of Plaintiff's mental functioning in the record includes social limitations. (*See* AR 84-85, 101, 109, 408, 442.)

harmless error analysis … may be appropriate to supply a missing dispositive finding where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.[21]

*Id.* at 733-34 (quotation marks and ellipsis omitted).

Here, the ALJ relied on her erroneous evaluation of Plaintiff's subjective symptom evidence about his psychological impairments to conclude that he has the RFC to interact with the general public for about two hours per day and with an unlimited number of coworkers and supervisors all day. (AR 29.) In light of the testimony, reports, and other evidence just discussed, I cannot confidently say that no reasonable administrative factfinder, following the correct analysis, could have reached a different conclusion. On the contrary, had the ALJ properly evaluated this evidence, she may have assessed a mental RFC with more restrictive social limitations, particularly as to how often Plaintiff can interact with the general public and/or how many coworkers and supervisors Plaintiff can tolerate being around. More restrictive social limitations, in turn, may have reduced or eliminated the other work the ALJ found Plaintiff could perform.[22] For these reasons, the ALJ's errors and omissions in evaluating Plaintiff's subjective symptom evidence regarding his psychological impairments were not harmless and require remand.

---

[21] However, courts "cannot attempt to supply a missing finding for the ALJ on legal or evidentiary matters that [she] did not consider because it risks violating the general rule against post hoc justification of administrative action." *Dye v. Barnhart*, 180 F. App'x 27, 31 (10th Cir. 2006) (quotation marks omitted).

[22] In this regard, I note that, according to the Dictionary of Occupational Titles: (a) a housekeeping cleaner "renders personal assistance to patrons," DOT 323.687-014, *Cleaner, Housekeeping*, 1991 WL 672783 (Jan. 1, 2016); (b) a small products assembler "[f]requently works at bench as member of assembly group," DOT 706.684-022, *Assembler, Small Products I*, 1991 WL 679050 (Jan. 1, 2016); and, (c) a power-screwdriver operator appears to work in a factory setting. DOT 699.685-026, *Power-Screwdriver Operator*, 1991 WL 678865 (Jan. 1, 2016).

**C.    The ALJ erred in analyzing Plaintiff's subjective symptom evidence regarding his shoulder impairment.**

1.    Evidence regarding Plaintiff's Shoulder Impairment

At his hearing before the ALJ, Plaintiff testified that he dislocated his left shoulder when he was about 19 years old. (AR 54.) He stated that his left shoulder joint "locks on [him] and it hurts, especially in the winter. So that hurts a lot[.]" (AR 54.) He indicated that he has problems reaching over his head and every day he sometimes has to "twist [his arm] a little bit because it pops." (AR 54.) He also testified that his ability to reach in front of him is "good," but that his ability to "reach[] out to the side" is "[n]ot that good." (AR 54.) According to Plaintiff, his left shoulder pain prevents him from lifting and carrying items heavier than a half-gallon of milk on that side. (AR 55.)

On January 18, 2020, consultative examiner John Herlihy, M.D., performed a physical examination of Plaintiff. (AR 393-98.) According to Dr. Herlihy, Plaintiff reported a 20-year history of left shoulder problems exacerbated by cold temperatures and improved by medication, with 10/10 pain on most days but not the day of examination. (AR 393.) Plaintiff further told Dr. Herlihy that his shoulder injury was "due to a traumatic event when he was assaulted in his 20s where they dislocated his shoulder." (AR 397.) On examination, Dr. Herlihy found that Plaintiff's left shoulder was tender to palpation, with limited range of motion on abduction and forward elevation. (AR 396-97.) Dr. Herlihy opined that Plaintiff has "mild limitations with lifting," and is also limited to reaching frequently, due to left shoulder pain. (AR 398.)

Plaintiff had left shoulder x-rays taken at Sun View Imaging Services on February 25, 2020. (AR 412.) These x-rays revealed "[m]oderate to severe osteoarthritic changes in the left glenohumeral joint" and "mild bilateral acromioclavicular joint osteoarthritic changes," as well as

the "[s]uggestion of a small ossified intra-articular loose body in the left shoulder axillary pouch region." (AR 412.)

On March 3, 2020, non-examining state agency consultant Sam Baker, M.D., reviewed Plaintiff's medical records and made findings regarding Plaintiff's physical RFC. (AR 81-83.) Among other things, he found that Plaintiff can: (1) lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; (2) crawl and climb ladders, ropes, and scaffolds frequently; and, (3) reach frequently on the left. (AR 81-82.) Dr. Baker further noted that Plaintiff's ability to reach is "[l]imited[.] Left in front and/or laterally[.] Left Overhead." (AR 82.)

At his August 2020 appointment with NP Montgomery, Plaintiff reported that he dislocated his left shoulder at age 19 when he "was beat up by a gang of people." (AR 424.) He reported chronic, frequent, deep, aching, anterior left shoulder pain ranging from 1/10 to 7/10. (AR 425.) He indicated that his shoulder catches, locks, pops, clicks, and buckles, and that the pain radiates down his arm, is improved by nonsteroidal anti-inflammatory drugs, and is aggravated by lifting, carrying, twisting, pushing, pulling, gripping, grasping, squeezing, throwing, and range of motion. (AR 425.) On examination, NP Montgomery found tenderness and limited range of motion. (AR 426.) She observed that Plaintiff "carries the left shoulder lower" and that "it comes in and out of the socket with [range of motion]," and also noted "grating" and "popping." (AR 426.) She prescribed ibuprofen.[23] (AR 426.)

On January 29, 2022, consultative examiner Laura Leija, M.D., performed a physical examination of Plaintiff. (AR 429-34.) At this examination, Plaintiff reported constant left

---

[23] "[I]buprofen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints)." https://medlineplus.gov/druginfo/meds/a682159.html (last accessed Jan. 22, 2025).

shoulder pain helped by Naproxen[24] and worse in cold weather. (AR 429.) On examination, Dr. Leija found the range of motion of Plaintiff's left shoulder to be limited on forward elevation, abduction, adduction, and external and internal rotation. (AR 430-32.) Dr. Leija opined that Plaintiff's ability to lift and carry is limited on the left due to range of motion and pain, and that he can lift up to 10 pounds.[25] (AR 434.)

On February 14, 2022, non-examining state agency consultant Jim Takach, M.D., reviewed Plaintiff's medical records and made findings regarding Plaintiff's physical RFC. (AR 103-06.) Among other things, he found that Plaintiff can: (1) lift and carry 20 pounds occasionally and 10 pounds frequently, and (2) frequently crawl and climb ladders, ropes, and scaffolds, but that he (3) should not push, pull, or reach overhead with his left upper extremity. (AR 103-05.)

    2.    <u>The ALJ erred in evaluating Plaintiff's subjective symptom evidence regarding his shoulder impairment.</u>

In his Motion, Plaintiff argues that the ALJ erred in evaluating his subjective symptom evidence regarding his left shoulder impairment. (Doc. 17 at 14-15.) Among other things, Plaintiff points out that the ALJ misstated subjective symptom evidence regarding his ability to reach laterally on the left. (Doc. 17 at 9; Doc. 26 at 2.) Specifically, the ALJ twice stated that "[per] [Plaintiff's] own testimony, [his] … lateral reaching is not limited," (AR 30-31), when in fact, Plaintiff testified that his ability to reach laterally is "[n]ot that good." (AR 54.) The ALJ plainly

---

[24] "[N]aproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine)." https://medlineplus.gov/druginfo/meds/a681029.html (last accessed Jan. 22, 2025).

[25] Dr. Leija restricted her functional assessment to Plaintiff's ability to sit, stand, walk, lift, and carry. (AR 433-34.) The only limitation she found was in Plaintiff's ability to lift and carry on the left. (AR 433-34.)

erred in evaluating Plaintiff's subjective symptom evidence in this regard. *Kepler*, 68 F.3d at 391; *Brownrigg*, 688 F. App'x at 546; *Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

Nor did the ALJ redeem her error by citing to other substantial evidence to support her assessment that Plaintiff is not limited in his ability to reach laterally on the left. *Cf. Pickup*, 606 F. App'x at 433-34. The ALJ did state that Plaintiff "testified that he does some odd jobs and stated that he rides his bike to get around town, which does require significant use of the shoulders to use the handlebars. He also said he hangs his laundry to dry, which again require[s] significant use of the shoulders." (AR 35.) But as a matter of common sense, one could engage in the activities the ALJ cited without much, if any, lateral reaching on the non-dominant side.

Moreover, according to Plaintiff's testimony and reports, "when considered at a more detailed realistic level, [his] activities are more consistent with his claims of significant physical limitation than" the ALJ concluded. *Krauser*, 638 F.3d at 1333. Specifically, Plaintiff testified that: (a) the "little odd jobs" he performs about twice a week consist of helping a friend take trash to the dump or "clean[ing] a little yard"; (b) he merely rides his bicycle "right down the street"; and, (c) he puts his laundry on hangers to dry. (AR 50-51, 61.) Viewed in that light, these activities are even less likely to demand left-sided lateral reaching. Yet the ALJ did not discuss whether she credited this testimony and if so, why she nevertheless relied on these activities to conclude that Plaintiff has no lateral reaching limitations.

In addition, the ALJ failed to discuss other significantly probative evidence that directly supports Plaintiff's testimony of limited left-sided lateral reaching. Specifically, the ALJ did acknowledge Dr. Herlihy's and Dr. Leija's findings that Plaintiff's left-shoulder range of motion is limited generally. (AR 31, 33.) But she did not acknowledge these examiners' specific findings that his left-shoulder range of motion is limited on several planes, including laterally. (*See* AR 397

(finding decreased left-shoulder range of motion on forward elevation and abduction); AR 432 (finding decreased left-shoulder range of motion on forward elevation, abduction, adduction, external rotation, and internal rotation).)

Furthermore, the ALJ's misstatement of Plaintiff's testimony and failure to discuss directly supportive evidence were not harmless. The ALJ expressly relied on her mistaken understanding of Plaintiff's testimony to reject Dr. Baker's finding and Dr. Herlihy's opinion that Plaintiff's ability to reach laterally on the left is limited. (AR 30-31; *see* AR 82, 398.) And she relied on her rejection of these opinions to assess an RFC that expressly excluded any lateral reaching limitations. (AR 29-32.) Had she properly considered Plaintiff's testimony, she certainly could have credited these opinions and assessed a more restrictive RFC, *i.e.*, one that included limitations on reaching not only overhead but also laterally. Considerable objective medical evidence supports Plaintiff's testimony of limited left-sided lateral reaching, including Dr. Herlihy's, NP Montgomery's, and Dr. Leija's exam findings and abnormal x-rays of Plaintiff's left shoulder. (AR 396-97, 412, 426, 430-32.)

A more restrictive RFC, in turn, may have changed the ALJ's determination that Plaintiff can perform other work that exists in significant numbers in the national economy. (*See* AR 35.) In making this determination, the ALJ relied on the testimony of a vocational expert ("VE"), who opined that a hypothetical individual with Plaintiff's assessed RFC could perform the requirements of the representative occupations of housekeeping cleaner, small products assembler, and power screwdriver operator. (AR 36; *see* AR 68-69.)

According to the Dictionary of Occupational Titles ("DOT"), each of the occupations on which the ALJ relied requires frequent reaching. *See* DOT 323.687-014, *Cleaner, Housekeeping*, 1991 WL 672783 (Jan. 1, 2016); DOT 706.684-022, *Assembler, Small Products I*, 1991 WL

24

679050 (Jan. 1, 2016); DOT 699.685-026, *Power-Screwdriver Operator*, 1991 WL 678865 (Jan. 1, 2016). As the ALJ noted, the VE did opine that a hypothetical individual with the limitations the ALJ assessed, including no more than occasional left-sided overhead reaching, could nevertheless perform these occupations. (AR 36, 69-70.) But he did *not* opine as to whether a hypothetical individual with Plaintiff's assessed limitations *plus* a limitation on left-sided lateral reaching could do so. (*See* AR 69-70.) Thus, on the present record, it is possible that these combined limitations would have reduced or eliminated the other work the ALJ found Plaintiff can perform and resulted in a finding of disability.[26] For these reasons, I cannot say that the ALJ's erroneous evaluation of Plaintiff's subjective symptom evidence regarding his shoulder impairment was harmless. *Fischer-Ross*, 431 F.3d at 733.

## V. CONCLUSION

In sum, the ALJ made clear factual errors, and failed to discuss significantly probative evidence, in evaluating Plaintiff's subjective symptom evidence regarding his psychological and shoulder impairments. These errors and omissions undermine the ALJ's assessment of Plaintiff's RFC and preclude a finding that substantial evidence supports the assessment. Nor were the ALJ's errors harmless. On the contrary, the evidence the ALJ inaccurately described and failed to discuss supports greater functional limitations than those the ALJ included in her RFC assessment and on which she relied in finding that Plaintiff could perform other work. Accordingly, I recommend that the Court GRANT the request for reversal and remand in Plaintiff's Memorandum of Law (Doc. 17), REVERSE the Commissioner's decision denying Plaintiff's disability claim, and REMAND

---

[26] Also, a more restrictive RFC that included both an additional left-sided lateral reaching limitation and one additional social limitations as discussed in Section IV.B., *supra*, would be even more likely to have reduced or eliminated other work available to Plaintiff.

this matter to the Commissioner for further proceedings in accordance with these Proposed Findings and Recommended Disposition.

**Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to Section 636(b)(1)(C), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico. A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE